# Supreme Court of Texas

No. 25-0149

In re Demaree Reed,

*Relator*

On Petition for Writ of Mandamus

JUSTICE YOUNG, with whom Justice Hawkins joins, concurring.

Our primary-jurisdiction doctrine emerged from its federal counterpart. As first adopted by the federal courts and later endorsed by this Court, primary jurisdiction served a narrow purpose: when an issue within an agency's exclusive jurisdiction arose in a case, courts would pause the suit and allow the agency to resolve that issue. The doctrine thus helped avoid friction among the branches and facilitated rapid, accurate decisions by whatever governmental entity was lawfully empowered to make them. But over time, the doctrine's reach has expanded considerably, and it is worth asking whether that expansion has gone too far. Today's version of the doctrine may work at cross-purposes with its original justification. Rather than allowing the executive branch to do its job without improper judicial interference, the doctrine may impede the judiciary in properly performing its work.

Today's case requires no final determination of the primary-jurisdiction doctrine's fate, and I gladly concur in the Court's well-reasoned

opinion. I write separately with a view to future cases. I briefly delineate the doctrine's origin and explain why we should consider restoring its original formulation, or even discarding it altogether, if we conclude that now-existing tools render it obsolete. We will be greatly aided if the lower courts, the bar, legal academics, and amici likewise refocus attention on the Texas primary-jurisdiction doctrine.

\*   \*   \*

The federal primary-jurisdiction doctrine, in Judge Posner's words, "is really two doctrines." *Arsberry v. Illinois*, 244 F.3d 558, 563 (7th Cir. 2001). In its "central and original form," the doctrine "applies only when, in a suit involving a regulated [entity] but not brought under the regulatory statute itself, an issue arises that is within the exclusive original jurisdiction of the regulatory agency to resolve," *id.*, thus functioning as an exclusive-agency-jurisdiction doctrine. "If the agency's resolution of the issue does not dispose of the entire case," therefore, "the case can resume subject to judicial review of that resolution along whatever path governs review of the agency's decisions, whether back to the court in which the original case is pending or, if the statute governing review of the agency's decisions designates another court, to that court." *Id.*

Before turning to the doctrine's "second" version, it is worth pausing to trace the original formulation back to the U.S. Supreme Court's seminal primary-jurisdiction-doctrine case, *Texas & Pacific Railway Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426 (1907). Coincidentally, that case concerned whether a Texas state court lacked jurisdiction to entertain a common-law suit challenging an interstate railway's shipping rates because such claims "must, under the [Interstate Commerce Act], primarily invoke redress

2

through the Interstate Commerce Commission, which body *alone* is vested with power originally to entertain proceedings for the alteration of an established schedule . . . ." *Id.* at 448 (emphasis added).

That question followed from Congress's having created a comprehensive regulatory scheme in which the ICC—the first modern federal regulatory agency—"was endowed with plenary administrative power to supervise the conduct of carriers, to investigate their affairs, their accounts, and their methods of dealing, and generally to enforce the provisions of the act" by, among other things, "hear[ing] complaints concerning violations of the [ICA]" and "order[ing] the carrier to desist from such violation[s] in the future." *Id.* at 438. And in the event the carrier refused to comply, the ICC could "compel compliance by invoking the authority of the courts of the United States . . . , prima facie effect in such courts being given to the findings of fact made by the Commission." *Id.* Allowing individual courts and juries to adjudicate whether any particular rate was reasonable, the Court concluded, would generate disuniformity that would undermine the ICA's purpose. *See id.* at 440–41. Courts therefore had "no primary jurisdiction to fix rates" and thus could not "do so at the suit of a single plaintiff who claims to have been damaged because an allowance paid its competitors was unreasonable in amount." *Mitchell Coal & Coke Co. v. Pa. R.R. Co.*, 230 U.S. 247, 256 (1913).

The Court continued to apply the primary-jurisdiction doctrine as an exclusive-agency-jurisdiction doctrine (and in this single context) in the early twentieth century. The cases were primarily interstate-railway disputes in which litigants asked federal or state courts, rather than the ICC, to exercise concurrent jurisdiction over questions that implicated the

ICC's core regulatory authority. *See, e.g., N. Pac. Ry. Co. v. Solum*, 247 U.S. 477, 484 (1918) (concluding that Minnesota courts "may not be resorted to" to assess the reasonableness of a railway's routing decision until the ICC had first resolved the question); *Midland Valley R.R. Co. v. Barkley*, 276 U.S. 482, 485 (1928) (holding that an Arkansas state-court action challenging a railway's failure to furnish cars could not be maintained because the reasonableness inquiry was "a matter for the [ICC]," not courts); *see also Rochester Tel. Corp. v. United States*, 307 U.S. 125, 139 n.22 (1939) (collecting cases); Diana R.H. Winters, *Restoring the Primary Jurisdiction Doctrine*, 78 Ohio St. L.J. 541, 552–62 (2017) (tracing the primary-jurisdiction doctrine's evolution and arguing that its original conception developed in the rate-setting and labor contexts).

Although the doctrine's original formulation arose to address ICC rate-setting issues, by the 1930s the Court had given the doctrine "general application" in any comparable regulatory context. *See Rochester Tel.*, 307 U.S. at 139 n.22 (citing *U.S. Navigation Co. v. Cunard S.S. Co.*, 284 U.S. 474 (1932) (Shipping Board), and *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41 (1938) (National Labor Relations Board)). The Court, for example, construed the Shipping Act of 1916 consistent with the "settled construction" of the ICA, under which the "questions essentially of fact and those involving the exercise of administrative discretion . . . were primarily within [the ICC's] exclusive jurisdiction." *Cunard*, 284 U.S. at 481. Just as the ICC exercised primary jurisdiction over rate-setting disputes for land carriers, the Shipping Board occupied an analogous role for water carriers and therefore had "exclusive preliminary jurisdiction" over certain issues arising under the Shipping Act. *Id.* at 485. Accordingly, courts could

4

not entertain certain antitrust challenges to the underlying shipping agreements until the Shipping Board had first passed on their validity. *See id.* at 487–88.

As originally formulated, therefore, the primary-jurisdiction doctrine applies "where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63–64 (1956) (holding that certain questions of tariff construction and reasonableness were within the ICC's "exclusive primary jurisdiction"); *see also Reiter v. Cooper*, 507 U.S. 258, 268 (1993) (describing primary jurisdiction in that way and adding that it requires a court to "stay[] further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling"). In other words, it applies where "the court has jurisdiction of the *case*, but the agency of the *issue*." *Arsberry*, 244 F.3d at 564.

At some point, however, lower federal courts enlarged the doctrine, giving rise to a second, advice-seeking formulation. This version of the doctrine applies not when an agency has *exclusive* jurisdiction to initially resolve an issue, but rather when "either court and agency have concurrent jurisdiction to decide an issue, or only the court has the power to decide it, and seeks merely the agency's advice." *Id.* The expansion is obvious. The doctrine makes sense when a non-judicial entity lawfully has sole authority to make a determination. It is less justifiable, but still plausible, when such an entity has concurrent authority along with the courts. But it is hard

5

to justify at all if the courts have sole authority.

The origin of this expansion of the doctrine is unclear. It seems to have developed primarily in the federal appellate courts. *See id.* at 563–64 (collecting cases); Winters, *supra*, at 569–72 (enumerating the factors federal appellate courts consider when applying the doctrine). The U.S. Supreme Court has never squarely endorsed it. (Indeed, the last time the Court appears to have applied the doctrine at all in a majority opinion was 28 years ago in *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33 (1998).) But the Court at least has hinted that the primary-jurisdiction doctrine may have broader application than its original conception. *See, e.g.*, *Ricci v. Chi. Mercantile Exch.*, 409 U.S. 289, 305 (1973) (stating that "prior agency adjudication of" the dispute would "be a material aid in ultimately deciding whether the Commodity Exchange Act forecloses this antitrust suit"); *Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 673 (2003) (Breyer, J., concurring in part and in the judgment) (enumerating prudential considerations—including "whether preliminary reference of issues to the agency will promote th[e] proper working relationship between court and agency"—that inform the primary-jurisdiction doctrine's application).

This Court, too, has been somewhat imprecise when it comes to applying our own primary-jurisdiction doctrine, and we, too, have allowed it to expand dramatically. We first endorsed it by refusing the application for writ of error in *Kavanaugh v. Underwriters Life Insurance Co.*, in which the court of civil appeals held that the Board of Insurance Commissioners had primary jurisdiction to determine whether an insurance company's directors were mismanaging the company and therefore should be removed. 231 S.W.2d 753, 756 (Tex. Civ. App.—Waco 1950, writ ref'd).

6

Because the board had the statutory authority and duty "to regulate and control mutual assessment companies" and "give all the relief [the plaintiffs] sought," the court held that the plaintiffs "should first apply to the Board for relief before seeking redress in the courts." *Id.* Accordingly, the trial court had correctly sustained the defendants' plea to the jurisdiction. *Id.* This application of our primary-jurisdiction doctrine, therefore, largely mirrored the federal primary-jurisdiction doctrine's original form.

We similarly treated primary jurisdiction as an exclusive-agency-jurisdiction doctrine in *Gregg v. Delhi-Taylor Oil Corp.*, the central question in which was

> whether the courts have the power to determine whether a subsurface trespass is occurring or is about to occur, or whether the Railroad Commission has this power *to the exclusion of the courts*, with the courts having the power only to review, under the substantial evidence rule, or otherwise, the action of the Commission.

344 S.W.2d 411, 412 (Tex. 1961) (emphasis added). We determined that the primary-jurisdiction doctrine did not apply precisely because the questions were "primarily judicial in nature." *Id.* at 415. And "[w]here the issue is one inherently judicial in nature . . . , the courts are not ousted from jurisdiction unless the Legislature, by a valid statute, has explicitly granted exclusive jurisdiction to the administrative body." *Id.*

In our more recent primary-jurisdiction cases, however, we have applied the doctrine more broadly. Indeed, because we have developed a separate basis for enforcing exclusive-agency jurisdiction, we have abandoned the use of the primary-jurisdiction doctrine as a tool for ensuring that courts stand down when agencies have exclusive jurisdiction. We

7

have treated the two doctrines as separate, explaining that exclusive-agency jurisdiction arises "when the Legislature gives the agency alone the authority to make the initial determination in a dispute" and authorizes courts to "review the administrative action only at the time and in the manner designated by statute." *Cash Am. Int'l Inc. v. Bennett*, 35 S.W.3d 12, 15 (Tex. 2000). In other words, "when a pervasive regulatory scheme indicates that" the legislature "intended for the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed," courts lack jurisdiction to consider claims implicating the agency's exclusive jurisdiction. *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 221 (Tex. 2002) (quotation marks omitted).

In theory, the Texas primary-jurisdiction doctrine could still apply to an *issue* over which an agency has exclusive jurisdiction despite the courts' having authority over the dispute as a whole. But when that happens, we no longer talk about primary jurisdiction—we just apply the exclusive-jurisdiction rules. In contemporary usage, we have said that primary jurisdiction is a wholly "prudential doctrine." *Forest Oil Corp. v. El Rucio Land & Cattle Co.*, 518 S.W.3d 422, 429 (Tex. 2017); *see also Subaru*, 84 S.W.3d at 220 ("Despite similar terminology, primary jurisdiction is prudential whereas exclusive jurisdiction is jurisdictional.").

Accordingly, the primary-jurisdiction doctrine currently "arises when a court and an agency have *concurrent* original jurisdiction over a dispute." *Cash Am.*, 35 S.W.3d at 18 (emphasis added); *see Subaru*, 84 S.W.3d at 221 (explaining that this "judicially-created primary jurisdiction doctrine operates to allocate power between courts and agencies when *both* have authority to make initial determinations in a dispute"). If there is

8

concurrent jurisdiction, we have said, courts "should allow an administrative agency to initially decide an issue when: (1) an agency is typically staffed with experts trained in handling the complex problems in the agency's purview; and (2) great benefit is derived from an agency's uniformly interpreting its laws, rules, and regulations, whereas courts and juries may reach different results under similar fact situations." *Forest Oil*, 518 S.W.3d at 429–30. The agency's initial determination, in turn, may not bind the court post-referral. *See Cash Am.*, 35 S.W.3d at 18 (explaining that the doctrine's purpose includes "ensuring that administrative agencies decide, at least initially, questions that" implicate agency expertise); *see also, e.g.*, *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 209 (Tex. 2002) (holding that the Motor Vehicle Board has "primary jurisdiction to determine, at least in the first instance, whether a right of first refusal violates the" Motor Vehicle Commission Code).

As I read our cases, our modern primary-jurisdiction doctrine has mostly become a mechanism for judges to learn an agency's view of an issue before a court ultimately decides it. If so, then the doctrine's legal effect undermines its modern justification. Courts refer proceedings to agencies in the name of expertise and uniformity while simultaneously disclaiming any obligation to adopt the agency's conclusion. If the agency's initial determination does not bind courts, uniformity is a largely illusory benefit, and agency expertise in and of itself does not impart decision-making authority. Litigants, in turn, face delayed resolution of their claims and pay additional legal fees—all so courts can hear what an agency thinks about an issue that is squarely within the judiciary's power to decide.

All of that strikes me as an inefficient and even somewhat dubious

9

way to obtain what is essentially an amicus brief. But, to be clear, I think that it can be highly desirable for courts to have the views of the government in cases where a judicial decision is likely to significantly affect regulatory programs in which agencies hold vast expertise and responsibility. The judiciary may have the obligation to decide legal issues without legal *deference* to an agency, but at the same time it should exhibit the virtue of humility by seeking information that we judges otherwise would lack. Indeed, as I have said before, "I am unaware of any appellate system that is as welcoming of amicus participation" as ours is, and far from being frustrated by too many amici's voices, "I frequently regret the absence of *any* amicus briefs" in even the most important cases. *Perez v. City of San Antonio*, 711 S.W.3d 204, 205 (Tex. 2024) (statement of Young, J., respecting the denial of the motion for participation in oral argument). I imagine that useful assistance is even less frequently forthcoming in the lower courts, but it would surely be at least as helpful. Especially when the interests of a co-equal branch of government are at stake, I would expect any Texas judge to welcome amicus submissions flexibly and respectfully. When the government has responsibility over a regulatory area, expertise in its underlying contours, and a stake in the work of the courts, we should expect its views to have the "power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Courts may retain the obligation—often the burden—to decide independently, but only a foolish court would reject the opportunity to avoid error by receiving the views of those able to assist it.

All of this is to say that the primary-jurisdiction doctrine may be out of date in its modern manifestation, but courts should not draw from that

10

conclusion that they ought to close their eyes and ears to the views of the executive branch. They should consider alternative means of soliciting an agency's advice while avoiding the practical costs that a formal referral would impose. They could simply *invite* agencies to participate as amici curiae. *See, e.g.*, *Ryan v. ChemLawn Corp.*, 935 F.2d 129, 132 (7th Cir. 1991) (reversing referral to the Environmental Protection Agency based on primary jurisdiction and noting that "[i]f the district court believed that it needed specific information from the EPA to decide this case, it could have asked the EPA to file an *amicus* brief"). And the respect that judges pay submissions from the executive branch should, I would hope, lead entities within that branch to begin to offer those views even without invitation. If an agency is concerned about uniformity, for example, one way to promote it is to express the agency's views to courts that confront cases that can help generate uniformity (or avoid spreading disuniformity).

But if referral *does* bind courts—or if, perhaps more likely, courts simply rubber-stamp agency conclusions—primary jurisdiction would often implicate a host of constitutional concerns, including the separation of powers and the right to a jury trial. *See In re CenterPoint Energy Houston Elec., LLC*, 629 S.W.3d 149, 164 (Tex. 2021) (plurality opinion) ("Courts are not free to outsource to [an agency] the authority to adjudicate common-law questions and factual disputes properly decided by judges and juries."); *cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024) (concluding that federal courts may not cede the task of legal interpretation to administrative agencies); *SEC v. Jarkesy*, 603 U.S. 109, 120–21 (2024) (holding that, when an agency's civil-enforcement action resembles a common-law cause of action and the "public rights" exception to Article III

11

jurisdiction does not apply, the Seventh Amendment guarantees a jury-trial right).

We need not resolve these important questions today because Rail Link has not asked the Surface Transportation Board to exercise concurrent jurisdiction over the underlying FELA dispute. But should the primary-jurisdiction doctrine reach this Court again, and if the petition presents a question of purely state law, I hope that the Court will consider, at the least, returning the doctrine to its original formulation rather than allow it to continue to metastasize.

_____
Evan A. Young
Justice

**OPINION FILED:** June 19, 2026